**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BARBARA GRAZIOLI,** individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> **FIVE BELOW, INC.,** <br><br> Defendant. | Civil Action No. <u>2:26-cv-04322</u> <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Barbara Grazioli, by and through her undersigned counsel, brings this Class Action Complaint against Defendant Five Below, Inc. ("Five Below") and alleges as follows based upon information and belief, except as to the allegations specifically pertaining to her, which are based on personal knowledge:

### Nature of Action

1. In early 2025, U.S. President Donald J. Trump imposed, via Executive Orders, tariffs on dozens of countries. In particular, as a senior fellow for international trade at the Council on Foreign Relations explained: "On April 2, 2025, [President] Trump … rais[ed] tariffs on nearly every U.S. trading partner to historic highs not seen since 1909. That action brought the average effective tariff rate to 22.5 percent …. Just seven days later, he reversed course, pausing the bulk

of those tariffs for ninety days, leaving a 10 percent across-the-board tax on imports – while raising tariffs on China to … 125 percent."[1]

2.  Imposition of these tariffs resulted in "a drastic increase in the revenue the [U.S.] government takes in from tariffs."[2]  In 2025, according to one report, "[t]he United States collected an estimated $287 billion in customs duties, taxes and fees …, nearly triple the amount in 2024."[3]

3.  "Tariffs are a tax on consumers," explained U.S. Senator Ted Cruz (R-Tex.).[4] "Experts tend[ed] to agree …, concluding that consumers [would] pay most of Trump's tariffs."[5]

4.  Although those tariffs were imposed directly on businesses, many businesses, including Five Below, turned around and passed the costs of the tariffs on to consumers via price increases (often explicitly linked to the tariffs) or even via specific tariff-related fees and/or surcharges.  Indeed, as reported in October 2025, Goldman Sachs economists determined that "American consumers were shouldering 37% of the burden" of the new tariffs.[6]  At that time, the

---

[1]  "A Year After 'Liberation Day,' Experts Review the Costs of Trump's Tariffs," *Council on Foreign Relations* (Apr. 2, 2026), https://www.cfr.org/articles/a-year-after-liberation-day-experts-review-the-costs-of-trumps-tariffs (last visited June 22, 2026) (quoting Inu Manak).

[2]  Ana Swanson, "The Effects of Tariffs, One Year Into Trump's Trade Experiment," *The New York Times* (Feb. 2, 2026), *available at* https://www.nytimes.com/2026/02/02/business/trump-tariffs-one-year-later.html (last visited June 22, 2026).

[3]  Swanson, *supra*

[4]  Joseph Thorndike, "Who Pays Tariffs?  Mostly Consumers, But That Wasn't Always True," *Forbes* (Jan. 12, 2026), *available at* https://www.forbes.com/sites/taxnotes/2026/01/12/who-pays-tariffs-mostly-consumers-but-that-wasnt-always-true/ (last visited June 22, 2026).

[5]  Thorndike*, supra.*

[6]  Eric Revell, "US businesses and consumers shoulder the bulk of tariff cost burden, Goldman Sachs finds," *Fox Business* (Oct. 21, 2025), https://www.foxbusiness.com/economy/us-businesses-consumers-shoulder-bulk-tariff-cost-burden-goldman-sachs-finds (last visited June 22, 2026).

economists "assessed that by the end of 2025, U.S. consumers [would] be absorbing 55% of the tariff costs …."[7]

5.      President Trump's asserted legal basis for being able to impose the tariffs was the International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.* ("IEEPA").[8]

6.      On February 20, 2026, however, the U.S. Supreme Court, in *Learning Resources, Inc. v. Trump*, 607 U.S. ----, 146 S. Ct. 628, 646 (2026), held that "IEEPA does not authorize the President to impose tariffs."  In other words, the Court "struck down President … Trump's far-reaching global tariffs."[9]

7.      Thereafter, "[a] U.S. trade court judge … ordered the government to begin paying potentially billions of dollars in refunds to importers who paid tariffs that the Supreme Court said … were collected illegally.  Judge Richard Eaton of the U.S. Court of International Trade [(the 'CIT')] in Manhattan … ordered the refunds to be made with interest."[10]

8.      As a result, the Trump Administration implemented a process by which it would refund to businesses the tariffs it had collected illegally.  On or about April 20, 2026, U.S. Customs and Border Protection ("CBP") "launch[ed] the first phase of the Consolidated Administration and Processing of Entries (CAPE) tool in the Automated Commercial Environment Secure Data Portal

---

[7]    Revell, *supra*

[8]    *See*, *e.g.*, "Regulating Imports With a Reciprocal Triff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits," Exec. Order No. 14257, 90 FR 15041, 2025 WL 1017655(Pres.) (Apr. 2, 2025) ("E.O. 14257").

[9]    Lindsay Whitehurst. "Supreme Court strikes down Trump's sweeping tariffs, sparking fierce pushback and vow of new levies," *Associated Press* (Feb. 21, 2026), *available at* https://apnews.com/article/supreme-court-tariffs-trump-0485fcda30a7310501123e4931dba3f9   (last visited June 22, 2026).

[10]   "Judge order U.S. Customs to process refunds on illegal Trump tariffs," *CNBC* (Mar. 4, 2026), https://www.cnbc.com/2026/03/05/judge-orders-us-customs-to-process-refunds-on-illegal-trump-tariffs.html (last visited June 22, 2026).

(ACE Portal).  CAPE [is intended to] simplify International Emergency Economic Powers Act (IEEPA) duty refund requests made pursuant to court order and in accordance with appropriate statutory authority by providing an electronic pathway to submit valid IEEPA duty refund claims."[11]

9.      By April 26, 2026, more than 75,000 refund requests already had been made.[12]  "As of May 11, [2026,] the CBP had already received over 126,000 applications covering 15.1 million qualifying entries.  Among those entries, 8.3 million shipments have been fully processed.  The anticipated total payout for those finalized cases alone – including interest – [stood at that time] at $35.46 billion.  That number, confirmed in a court filing by a senior CBP official, signals the sheer scale of what is already in motion."[13]

10.      Upon information and belief, the identities of those businesses that have applied for and/or received refunds are not automatically publicly disclosed or available.  The only way to know, therefore, whether a business has in fact applied for or received a refund(s) is if the business itself makes some public statement(s) to that effect.

11.      Although consumers largely paid for the tariffs, they are ***not*** likely to realize any benefit from the refunds:

---

[11]   U.S. Customs and Border Protection, "Consolidated Administration and Processing of Entries (CAPE) Phase 1" (Last updated: Apr. 8, 2026), *available at* https://www.cbp.gov/sites/default/files/2026-04/trade_information_notice_cape_508c.pdf (last visited June 22, 2026) ("CAPE Notice"), at 1.

[12]   *See* Megan Cerullo, "Feds have rejected 15% of businesses' tariff refund claims," *CBS News* https://www.cbsnews.com/news/tariff-refund-portal-trump-cbp/ (last visited June 22, 2026) ("As of April 26, [CBP] had received more than 75,000 refund requests from U.S. businesses and other importers.  More than 47,000 claims encompassing some 11 million tariff payments were properly filed, CBP official Brandon Lord said in a filing with the Court of International Trade on Tuesday.").

[13]   Piyush Shukla, "Trump tariff refund checks begin disbursing this week – who qualifies and why are millions excluded from payouts," *The Economic Times* (May 14, 2026), https://economictimes.indiatimes.com/news/international/us/trump-tariff-refund-checks-begin-disbursing-this-week-who-qualifies-and-why-are-millions-excluded-from-payouts/articleshow/131093826.cms (last visited June 22, 2026).

Consumers hoping for relief from potential tariff refunds are unlikely to see any meaningful financial benefit as companies signal they intend to keep any repayments rather than pass them through to households, according to the latest CNBC CFO Council survey.

…

The CNBC CFO Council survey, which polled chief financial officers at large U.S. companies between March 23 and April 2, showed that 12 out of 25 executives said their firms would apply for tariff refunds.

However, ***none of those surveyed indicated that they plan to pass any portion of those refunds on to customers***.  On the same note, six respondents said they would not share any of the funds at all, while seven remained uncertain, and 12 said the issue was not applicable to their operations.[14]

12.     In other words, businesses, such as Five Below, which received and appreciated benefits from their customers, will end up with a windfall(s) at those consumers' expense. Businesses, such as Five Below, collected money – in the form of price increases, fees, and/or surcharges – from consumers to pay for the tariffs imposed on businesses by the 2025 executive orders.  While the (often explicit) representation(s) that the increase(s), fee(s), and/or surcharge(s) was a result of, due to, and/or intended to offset any and/or all those tariffs may technically have been true at the time it was made, the tariffs ultimately were held to be illegal.  As such, businesses, such as Five Below, are eligible for a refund(s) of amounts they paid in tariffs.  Whether any business chooses to apply for a refund is its choice – after all, the tariffs were imposed on businesses (not consumers).  However, businesses, such as Five Below, voluntarily and

---

[14]   Merin Rebecca Thomas, "Tariff Refunds Set To Bypass Consumers As Companies Keep Payouts, CFO Survey Finds," *International Business Times* (Apr. 13, 2026), *available at* https://www.ibtimes.com/tariff-refunds-set-bypass-consumers-companies-keep-payouts-cfo-survey-finds-3801186 (last visited June 22, 2026) (emphasis added). *See also*, *e.g.*, Rachel Barber, "Businesses are getting tariff refunds.  Will consumers see any money?," *USA Today* (Apr. 30, 2026), *available at* https://www.usatoday.com/story/money/2026/04/30/business-tariff-refund-consumers-prices/89871794007/ (last visited June 22, 2026) ("While companies shouldered much of the tariff costs, at least some were passed to shoppers through higher shelf prices.  Still, consumers aren't likely to see direct refunds or lower prices across the board, according to Jackson Wood, director of industry strategy for Descartes' Global Trade Intelligence business unit.").

intentionally decided to pass on the cost of those tariffs to consumers.  Thus, no longer required to pay the tariffs, businesses, such as Five Below, have received a windfall(s).  Regardless whether a business seeks and/or obtains a refund(s) from the federal government, it would be unfair and inequitable for a business not to return the money it collected from consumers under these circumstances.  Consumers should ***not*** be forced to bear the costs of tariffs that businesses themselves no longer have to or had to pay.[15]

## The Parties

13.    Plaintiff Ms. Grazioli – a citizen of the State of New Jersey – is a resident of Maple Shade, New Jersey.

14.    Defendant is a Pennsylvania corporation that was incorporated under the laws of Pennsylvania in January 2002.  Its principal executive offices are located at 701 Market Street, Suite 300, Philadelphia, Pennsylvania 19106.  Defendant is a citizen of Pennsylvania.

15.    Five Below has 1,921 stores across 46 states; its net sales for Fiscal Year 2025 totaled approximately $4.76 billion.[16]

## Jurisdiction and Venue

16.    This Court has personal jurisdiction over Defendant because, at a minimum, Five Below's principal place of business is located in the Commonwealth of Pennsylvania; it regularly transacts business in the Commonwealth; it is at home in the Commonwealth and has continuous

---

[15]    *See also infra* at 15 n.41.

[16]    *See* "Five Below, Inc. Announces Fourth Quarter and Fiscal 2025 Financial Results," *five Below*, *available    at*    https://investor.fivebelow.com/news/press-release-details/2026/Five-Below-Inc--Announces-Fourth-Quarter-and-Fiscal-2025-Financial-Results/default.aspx  (last  visited  June  22, 2026).

and systematic contacts with the state; it is a citizen of the Commonwealth; and/or as otherwise permitted by law.

17.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. §1332(d)(2) because this action is (i) a class action; (ii) in which the matter in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one member of the class of plaintiffs is a citizen of a state (*e.g.*, New Jersey) different from Defendant.

18.     Venue is proper in this Court pursuant to, at least, 28 U.S.C. §1391(b)(2)-(3) because, *inter alia*, a substantial part of the events or omissions giving rise to the claim(s) occurred in this district and/or Defendant is subject to personal jurisdiction in this district, and/or as otherwise permitted by law.

### **Background**

***Tariffs Generally***

19.     "The definition of a tariff is fairly straightforward – it's a tax on goods coming from another country."[17]

---

[17]   Elisabeth Buchwald, "What is a tariff and how does it work," *CNN* (Feb. 4, 2025), https://www.cnn.com/2025/02/04/business/what-is-tariff-definition-meaning (last visited June 22, 2026)). *See also*, *e.g.*, "Tariff," *Tax Foundation*, https://taxfoundation.org/taxedu/glossary/tariffs/ (last visited June 22, 2026) ("Tax Foundation") ("Tariffs are taxes imposed by one country on goods imported from another country."); Scott Nevil, "What Is a Tariff and Why Are They Important," *Investopedia* (May 10, 2026), https://www.investopedia.com/terms/t/tariff.asp (last visited June 22, 2026) ("A tariff is a tax imposed by one country on the goods and services imported from another country to influence it, raise revenues, or protect competitive advantages.").

20.     Tariffs are imposed on the business importing the goods.[18]  Tariffs are ***not*** imposed directly on consumers.  That said, although "[i]mporters pay tariffs to their home governments, … most economists find that the bulk of tariffs are passed on to consumers."[19]

21.     Tariffs cause an increase in prices of the goods on which tariffs have been placed as well as other goods into which the taxed goods are incorporated.[20]  "While tariffs are often described as a tax on foreign businesses and do place an economic burden on foreign exporters, the costs are often borne by consumers in the country that is imposing them."[21]

22.     "Importers who pay the tax initially will typically raise prices to pass this additional cost along to consumers, known as 'price pass-through.'  The precise degree of pass-through will differ by good and sector:  It is driven largely by factors such as the degree of a company's market power and consumer sensitivity to price changes.  But ***substantial research convincingly demonstrates that it is U.S. households who ultimately pay for tariffs***."[22]

---

[18]    *See*, *e.g.*, Jennifer Clarke, "What tariffs has Trump introduced and why," *BBC News* (Feb. 24, 2026), https://www.bbc.com/news/articles/cn93e12rypgo (last visited June 22, 2026) ("The tax is paid to the government by companies bringing in the foreign products."); Buchwald, *supra* ("Domestic businesses that import products into the country pay the tariffs up front ….").

[19]    "What Are Tariffs*,"* *Council on Foreign Relations* (Apr. 1, 2025), https://www.cfr.org/backgrounders/what-are-tariffs (last visited June 22, 2026).

[20]    *See, e.g.,* Tax Foundation, *supra* ("Tariffs are trade barriers that raise prices ….").

[21]    Tax Foundation, *supra*.

[22]    Adam S. Hersh & Josh Bivens, "Tariffs – Everything you need to know but were afraid to ask," *Economic Policy Institute* (Updated March 28, 2025), *available at* https://www.epi.org/publication/tariffs-everything-you-need-to-know-but-were-afraid-to-ask/ (last visited June 22, 2026) (emphasis added).

*The Trump Administration's 2025 Tariffs*

23.    "Shortly after taking office," the Supreme Court explained, "President Trump sought to address two foreign threats.  The first was the influx of illegal drugs from Canada, Mexico, and China.  The second was 'large and persistent' trade deficits."[23]

24.    To address these threats, President Trump issued a series of Executive Orders, including (a) Executive Order 14193 ("Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border") (Feb. 1, 2025); (b) Executive Order 14194 ("Imposing Duties to Address the Situation at Our Southern Border) (Feb. 1, 2025); (c) Executive Order 14195 ("Imposing Duties To Address Synthetic Opioid Supply Chain in the People's Republic of China") (Feb. 1, 2025); and (d) E.O. 14257 (collectively, the "2025 Executive Orders").

25.    The purported authority for issuing the 2025 Executive Orders and imposing the tariffs established thereby was IEEPA, which "provides the President broad authority to regulate a variety of economic transactions following a declaration of national emergency."[24]

26.    After "imposing each set of tariffs," the Supreme Court explained, "the President … issued several increases, reductions, and other modifications.  One month after imposing the 10% drug trafficking tariffs on Chinese goods, he increased the rate to 20%.  One month later, he removed a statutory exemption for Chinese goods under $800.  Less than a week after imposing the reciprocal tariffs, the President increased the rate on Chinese goods from 34% to 84%.  The very next day, he increased the rate further still, to 125%.  This brought the total effective tariff

---

[23]    *Learning Res.*, 146 S. Ct. at 635-36 (citations omitted).

[24]    "The International Emergency Economic Powers Act:  Origins, Evolution, and Use," *Congressional Research Service* (Updated Sept. 1, 2025), *available at* https://www.congress.gov/crs_external_products/R/PDF/R45618/R45618.16.pdf (last visited June 22, 2026).  *See also, e.g.*, E.O. 14257 ("By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) (IEEPA) ….").

rate on most Chinese goods to 145%. The President … also shifted sets of goods into and out of the reciprocal tariff framework. And he … issued a variety of other adjustments."[25]

27. To compensate for the 2025 Executive Orders and the tariffs they imposed, many U.S. businesses raised prices of the goods onto which the tariffs were placed (and/or of goods into which the taxed goods were incorporated).[26] "In some cases, companies [were] explicit, citing the estimated toll tariffs will take on their bottom lines and breaking down which countries their supply chains rely on. Other retailers have been less forthcoming, avoiding the word 'tariff' and instead blaming strategy shifts or price hikes on 'macroeconomic uncertainty' – or simply refusing to point the finger at all."[27]

28. Some U.S. businesses even "introduc[ed] 'tariff surcharges,' announcing new prices on their websites and in letters to consumers."[28]

---

[25] *Learning Res.*, 146 S. Ct. at 636 (citations omitted) (citing additional executive orders). *See also*, *e.g.*, *supra* at ¶ 1.

[26] *See*, *e.g.*, "Major brands from tech to fashion announce price hikes due to Trump's new tariffs: Here's what will cost you more," *The Economic Times* (Apr. 20, 2025), https://economictimes.indiatimes.com/news/international/us/major-brands-from-tech-to-fashion-announce-price-hike-due-to-trumps-new-tariffs-heres-what-will-cost-you-more/articleshow/120460851.cms (last visited June 22, 2026) ("A growing list of global firms has confirmed plans to raise prices in the U.S. market, citing the direct impact of newly introduced Trump's tariffs."); Ali McCadden, "Here are the retailers raising prices as Trump tariffs take hold," *CNBC* (May 31, 2025), https://www.cnbc.com/2025/05/31/trump-tariffs-here-are-the-retailers-raising-prices.html?msockid=1db8d62d7f996c2e2ff0c0507e076d19 (last visited June 22, 2026) ("As they reported earnings in recent weeks, multiple major retailers said they have already raised some prices or plan to hike them in the coming weeks to offset the duties.").

[27] McCadden, *supra*.

[28] Megal Cerullo, "Consumers now face 'tariff surcharges' for some goods as companies pass along costs," *CBS News* (Apr. 11, 2026), https://www.cbsnews.com/news/trump-tariff-surcharge-prices/ (last visited June 22, 2026). *See also*, *e.g.*, Aditi Shrikant, "CEO adds a 'Trump tariff surcharge' to products from China: 'I want people to understand how it impacts us,'" *CNBC* (Apr. 10, 2025), https://www.cnbc.com/2025/04/10/ceo-adds-a-trump-tariff-surcharge-to-products-from-china.html?msockid=1db8d62d7f996c2e2ff0c0507e076d19 (last visited June 22, 2026) ("Dame, a sexual wellness brand, is putting what it calls a 'Trump tariff surcharge' of $5 on all vibrators, which it imports from China.").

*Five Below Price Increases*

29.    Five Below, upon information and belief, increased prices it charged to consumers in direct response to the 2025 tariffs imposed on it.  "Management stated ***that tariff impacts were fully offset at the item level through pricing actions***, vendor negotiations and product redesign. Pricing contributed a relatively larger share …."[29]  During an early 2025 earnings call, Five Below's chief financial officer specifically "said that one of the initiatives to deal with the tariffs is 'selective price adjustments.'"[30]  Of course, "pricing actions" and "selective price adjustments" are just euphemisms for price increases.[31]  Obviously, Five Below did ***not*** adjust its prices downward to deal with tariffs.

*Ms. Grazioli's Experiences*

30.    Ms. Grazioli frequently shops at and purchases from Five Below,  Ms. Grazioli most often (if not exclusively) shops at and purchases in person from Five Below.

31.    More than once, Ms. Grazioli – in person – shopped at and purchased from Five Below between April 2, 2025 and February 20, 2026.

---

[29]    Swagata Bhattacharya, "Five Below's Tariff Management Mitigates Cost Pressures Effectively," *Zacks* (May 4, 2026), *available at* https://finance.yahoo.com/economy/policy/articles/five-belows-tariff-management-mitigates-165400686.html?guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2 xlLmNvbS8&guce_referrer_sig=AQAAAA6xRp_qQTI1VSt7i5h2RZoJdTV_cKEOTE3z9XfctFFhH zMnJBKoYoAojjOwuv2QYCeGUb7v6hqHLHVhlOFjOZkKqvwC6WlwN_VWOFb1Ay8_fOv8Mgi vb-E7GZzp7TGg9uisCpA7f1pwquevQlI15-OcpcPFxkwC0Z8NHyiUp7wd (last visited June 22, 2026) (emphasis added). *See also*, *e.g.*, "Form 10-K (For the fiscal year ended February 1, 2025), Five Below, Inc." *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001177609/cb9421d8-b4d8-4b92-919d-a69df5db098c.pdf (last visited June 22, 2026) ("2025 Five Below Annual Report'), at 18 ("In particular, tariffs imposed by the U.S. government could increase the cost to us of certain products, lower our margins, increase our import related expenses, cause us to increase our prices to consumers, and reduce consumer spending on discretionary items ….") (emphasis omitted).

[30]    Anne Erickson, Five Below Considering 'Price Adjustments,'" *Men's Journal* (Mar. 29, 2025), *available at* https://www.mensjournal.com/news/five-below-considering-price-adjustments (last visited June 22, 2026).

[31]    *Cf.*, *e.g.*, *infra* at 11 n. 29 (quoting 2025 Five Below Annual Report).

32.     Generally – and, specifically, between April 2, 2025 and February 20, 2026 – Ms. Grazioli purchased, in addition to other goods, beauty supplies, electronics, and clothing from Five Below.

33.     Between April 2, 2025 and February 20, 2026, Ms. Grazioli (like other Five Below customers) paid higher prices on those purchases than at other times.  Upon information and belief, those price increases were a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders.

***Learning Resources v. Trump***

34.     On February 20, 2026, the Supreme Court, in an opinion authored by Chief Justice Roberts, struck down the tariffs imposed by the 2025 Executive Orders, finding that IEEPA did not empower the President to impose the tariffs.

35.     The Court explained:

[T]the Government reads IEEPA to give the President power to unilaterally impose unbounded tariffs.  On this reading, moreover, the President is unconstrained by the significant procedural limitations in other tariff statutes and free to issue a dizzying array of modifications at will.  All it takes to unlock that extraordinary power is a Presidential declaration of emergency, which the Government asserts is unreviewable.  And the only way of restraining the exercise of that power is a veto-proof majority in Congress.  That view, if credited, would "represent[] a 'transformative expansion'" of the President's authority over tariff policy, and indeed – as demonstrated by the exercise of that authority in this case – over the broader economy as well.  It would replace the longstanding executive-legislative collaboration over trade policy with unchecked Presidential policymaking.[32]

36.      In the end, the Court rejected that argument:

The President asserts the extraordinary power to unilaterally impose tariffs of unlimited amount, duration, and scope.  In light of the breadth, history, and constitutional context of that asserted authority, he must identify clear congressional authorization to exercise it.

---

[32]    *Learning Res.*, 146 S. Ct. at 640 (citations omitted).

IEEPA's grant of authority to "regulate ... importation" falls short. IEEPA contains no reference to tariffs or duties. The Government points to no statute in which Congress used the word "regulate" to authorize taxation. And until now no President has read IEEPA to confer such power.

We claim no special competence in matters of economics or foreign affairs. We claim only, as we must, the limited role assigned to us by Article III of the Constitution. Fulfilling that role, we hold that IEEPA does not authorize the President to impose tariffs.[33]

### *Tariff Refunds*

37. After the Supreme Court struck down the tariffs, the CIT, in March 2026, "ordered [CBP] to issue refunds for levies US President Donald Trump introduced last year under the International Emergency Economic Powers Act (IEEPA)."[34]

38. Specifically, on March 4, 2026, Judge Eaton entered an Order in *Atmus Filtration, Inc. v. United States*, No. 26-01259 (Ct. Int'l Trade Mar. 4, 2026), which ordered "that, with respect to any and all unliquidated entries that were entered subject to the IEEPA duties, [CBP] is hereby directed to liquidate those entries without regard to the IEEPA duties. Any liquidated entries for which liquidation is not final shall be reliquidated without regard to IEEPA duties."[35]

39. On March 27, 2026, Judge Eaton entered another Order in the same case, amending his prior Order(s). "The amended order now includes similar instruction for finally liquated

---

[33]   *Learning Res.*, 146 S. Ct. at 646.

[34]   Danielle Kaye, "US trade court orders tariff refunds in setback for Trump administration," *BBC* (Mar. 4, 2026), https://www.bbc.com/news/articles/c1d66k5r1x4o (last visited June 22, 2026).

[35]   Order, *Atmus Filtration, Inc. v. United States*, No. 26-01259 (Ct. Int'l Trade Mar. 4, 2026), *available at* https://storage.courtlistener.com/recap/gov.uscourts.cit.19346/gov.uscourts.cit.19346.21.0_2.pdf (last visited June 22, 2026).

entries, with the Court directing CBP to reliquidate such entries 'without regard' for IEEPA tariffs

…."[36]

40.      Accordingly, CBP launched the CAPE tool, which can be used by businesses to obtain tariff refunds.[37] "CAPE," according to CBP, "will simplify [IEEPA] duty refund requests made pursuant to court order and in accordance with appropriate statutory authority by providing an electronic pathway to submit valid IEEPA duty refund claims."[38]

41.      CBP explains, *inter alia*:

U.S. Customs and Border Protection (CBP) will issue validated refunds for duties paid under the International Emergency Economic Powers Act (IEEPA). Declarations are submitted and processed using the new Consolidated Administration and Processing of Entries (CAPE) tool, which enables batch handling of IEEPA duty refunds.[39]

### *Five Below's Response to Available Refunds*

42.      In its most recent annual report, Five Below stated:   "In February 2026, the Supreme Court of the U.S. issued a ruling striking down certain tariffs previously imposed under

---

[36]   Phil Neuffer, "Tariff refunds:   Court expands scope to include finally liquidated entries," *SupplyChainDive* (Mar. 30, 2026), *available at* https://www.supplychaindive.com/news/tariff-refunds-cit-expands-scope-finally-liquidated-entries/816080/ (last visited June 22, 2026).

[37]   "The new portal is an effort to simplify the tariff refund process so that importers can receive their refund with interest through one electronic payment rather than through an entry-by-entry basis, CBP said."   Miranda Jeyaretnam, "How Businesses Can Apply for Tariff Refunds Through New Portal," *Time* (Apr. 17, 2026), *available at* https://time.com/article/2026/04/17/tariff-refund-cbp-import-duties-trump/ (last visited June 22, 2026).

However, "[e]veryday people can't use it to apply for refunds, even though tariffs cost the average American household $1,000 in 2025."   Peter Grieve, "We asked 19 Companies if They Plan to Give Customers Tariff Refunds.   Only 3 Replied," *Money* (Apr.   22, 2026), *available at* https://money.com/companies-giving-tariff-refunds/ (last visited June 22, 2026).

[38]   CAPE Notice, *supra*, at 1.

[39]   U.S. Customs and Border Protection, "IEEPA Duty Refunds Fact Sheet," *available at* https://www.cbp.gov/sites/default/files/2026-04/ieepa_refunds_factsheet_0.pdf (last visited June 22, 2026).

the International Emergency Economic Powers Act ('IEEPA').  The ultimate availability, timing, and amount of any potential refunds of such tariffs remain highly uncertain and are subject to further legal, regulatory, and administrative developments."[40]

43.     Five Below is entitled to seek a refund(s) of the tariffs imposed by the 2025 Executive Orders that it paid and passed on to its customers by way of, at a minimum, price increases.

44.     Upon information and belief, Five Below has not stated publicly that it has in fact applied for any refund(s).  As such, it is currently unknown whether Five Below is seeking or has filed for a refund(s) of the illegal tariffs it paid.[41]

45.     Upon information and belief, Five Below has not stated publicly that it intends to provide any consumer(s) any refund(s) for any extra amount(s) the consumer(s) paid for any good(s) due to the illegal tariffs.

46.     Upon information and belief, Five Below has not refunded or returned to consumers the extra amounts they paid – in the form of increased prices or otherwise – for any goods as a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders.

---

[40]   "Form 10-K (For the fiscal year ended January 31, 2026), Five Below, Inc." *available at* https://www.sec.gov/Archives/edgar/data/1177609/000117760926000010/five-20260131.htm   (last visited June 22, 2026), at 69.

[41]   Whether Five Below has requested, and/or will seek, a refund(s) from the United States for the tariffs it paid is *immaterial* to the instant claim.  Five Below has the legal right to do so; whether it chooses to request a refund(s) is its choice.  Regardless whether it seeks and/or obtains a refund(s), it has obtained a benefit from consumers – that is, the extra amounts charged to and paid by consumers as a result of, due to, and/or to offset the costs of the tariffs – and it would be unjust for Five Below to retain that benefit now that the tariffs have been declared illegal.  Of course, if Five Below does obtain a refund(s) without issuing a corresponding refund(s) to its customers, its conduct would be that much more egregious and the retention of those amounts would be that much more unjust.  It would constitute worse "double recovery."  To be clear, though, Five Below's receipt of a refund(s) is *not* a condition of Plaintiff's recovery here.  Regardless, Five Below is experiencing a windfall.  *See also supra* at ¶ 12.

**Class Allegations**

47.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this class action on behalf of herself and all other individuals who are similarly situated.

48.     Plaintiff seeks to represent a class of persons to be defined as follows:

All individuals who were charged an increased price(s) by Defendant as a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders (the "Class").

49.     Specifically excluded from the Class are (a) Defendant; (b) any of its parents, subsidiaries, affiliates, divisions, predecessors, successors, or any other entities it legally controls; (c) each of their officers, directors, members, agents, trustees, employees, principals, servants, partners, or representatives, as well as each of their parents, spouses, children, trusts, heirs, successors, and assigns; and (d) the judicial officer to whom this case is assigned and his or her parents, spouses, children, trusts, heirs, successors, and assigns.

50.     Subject to additional information obtained through further investigation and discovery, Plaintiff reserves the right to amend, narrow, or expand the class definition(s).

51.     *Numerosity:*  The Class is so numerous that joinder of all members is impracticable. Although the precise number of Class members is unknown to Plaintiff at this time, it is likely to number in the thousands (if not more) given the amount of sales that Defendant completes annually.[42]  The names and addresses of all affected individuals are known to Defendant and can be identified through Defendant's records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

---

[42]    *See*, *e.g.*, *supra* at ¶ 15.

16

52.     *Commonality:*  There are questions of law and fact common to the members of the Class including, without limitation, whether retention of, at a minimum, the tariff-related price increases paid by consumers as a result of due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders constitutes unjust enrichment, especially when the tariffs have been struck down and/or refunds have been made available to businesses that paid the tariffs.  Similarly, there are common questions of law and/or fact concerning whether, in good conscience and/or equity, at a minimum, the price increases paid by consumers as a result of, due to, and/or to offset any or all those tariffs being imposed on Defendant belong to and ought to be paid, returned, and/or refunded to Plaintiff and the Class members.  In addition, common questions include ones concerning the amount of damages and other relief – including, but not limited to, declaratory relief – to be awarded to Plaintiff and the Class members.

53.     *Typicality:*  Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and the other Class members each were charged, at a minimum, an increased price(s) by Defendant as a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders.

54.     *Adequacy of Representation:*  Plaintiff is an adequate class representative because (i) Plaintiff's interests do not conflict with the interests of the other Class members whom Plaintiff seeks to represent; (ii) Plaintiff has retained competent counsel who are experienced in complex class-action litigation; and (iii) Plaintiff intends to prosecute this action vigorously.  The Class members' interests will be fairly and adequately protected by Plaintiff and Plaintiff's counsel.

55.     *Predominance:*  Common questions of law and fact predominate over any questions affecting only individual Class members.  Similar or identical violations, business practices, and injuries are involved.  Individual questions, if any, pale by comparison, in both quality and

17

quantity, to the numerous common questions that dominate this action.  For example, Defendant's liability is common to Plaintiff and each member of the Class.

56.    *Superiority:*  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiff and the Class members are relatively small, making it impracticable for any Class member to bear the burden and expense required to individually prosecute claims against Defendant.  Even if Class members could afford individual litigation, the court system could not.  Individual litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class-action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

57.    *Ascertainability:*  Members of the Class are ascertainable.  Class membership is defined using objective criteria, and Class members may be readily identified through Defendant's books and records.

## COUNT I
### UNNJUST ENRICHMENT
### (On behalf of Plaintiff and the Class)

58.    Paragraphs 1-57 above are incorporated by reference as though fully set forth herein.

59.    Defendant was unjustly enriched at the expense of Plaintiff and the Class members.

60.    Plaintiff and Class members conferred a benefit on Defendant by paying, at a minimum, the price increase(s) charged by Defendant as a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders.  But for the tariffs first imposed on

18

Defendant in 2025, Plaintiff and the Class members would not have been charged or required to pay the price increases.

61.     Defendant knowingly accepted and received the benefits conferred upon it by Plaintiff and Class members.

62.     Defendant has retained the full benefit(s) of, at a minimum, the price increase(s) paid by Plaintiff and the Class members as a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders.

63.     Those tariffs have been determined to be unlawful, and Defendant had and has no basis to collect and/or retain the associated amounts from Plaintiff or the members of the Class.  If Defendant – who can seek and obtain a refund for payment(s) of the tariffs imposed by the 2025 Executive Orders – is permitted to retain the tariff price increases, it will obtain a windfall(s) at Plaintiff's and the Class members' expense.

64.     It would be unjust and inequitable for Defendant to retain that benefit(s) under the factual circumstances set forth above – most notably, the Supreme Court's ruling in *Learning Resources*.

65.     Relevant losses, injuries, harms, and damages are continuing, on-going, and/or increasing.

**COUNT II**
**MONEY HAD AND RECEIVED**
**(On behalf of Plaintiff and the Class)**

66.     Paragraphs 1-65 above are incorporated by reference as though fully set forth herein.

67.     As a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders, Defendant compelled Plaintiff and the Class members to pay, at a minimum, increased prices for at least certain goods.

68.     That money was paid by Plaintiff and the Class members to Defendant and should be returned to them.

69.     At the time that the money was paid and received, the parties were operating under a mistake(s) of fact – that is, that the tariffs were legal and had to be paid.  They were not; the tariffs were in fact illegal.

70.     The money that was paid by Plaintiff and the Class members as a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders, which have now been struck down by the Supreme Court, and/or any refund(s) received by Defendant for the illegal tariffs it paid, in good conscience and/or equity belong to and ought to be paid, returned, and/or refunded to Plaintiff and the Class members.

71.     Retention of those amounts by Defendant would be wrongful, unjust, and/or inequitable.

72.     Defendant is obliged by equity to refund, return, and/or pay these amounts to Plaintiff and the Class members.

73.     Defendant has not, however, returned that money to Plaintiff or the Class members.

74.     Relevant losses, injuries, harms, and damages are continuing, on-going, and/or increasing.

**COUNT III**
**DECLARATORY JUDGMENT**
**(On behalf of Plaintiff and the Class)**

75.     Paragraphs 1-74 above are incorporated by reference as though fully set forth herein.

76.     Pursuant to 28 U.S.C. § 2201(a), "[i]n a cause of actual controversy within its jurisdiction," this Court, "upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "Any such declaration shall have the force and effect of a final judgment or decree and shall be renewable as such." *Id.*

77.     There is an actual, substantial controversy that is real and immediate between the parties, who have adverse legal interests. Issuance of a declaratory judgment here would serve a useful purpose in clarifying the parties' legal relations.

78.     Plaintiff and the Class members are entitled to a declaration that a business actually seeking and/or receiving a refund from the federal government for amounts paid as a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders is ***not*** a condition, precondition, or prerequisite for a consumer being able to seek and/or receive a refund(s) of any amounts the consumer paid to a business as a result of, due to, and/or to offset any or all of those tariffs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     an Order certifying this action as a class action, appointing Plaintiff as class representative for the Class, and appointing her counsel to represent the Class;

21

B. an award, the return or refund, or restitution of all monies acquired by Defendant by means of any and all illegal, improper, wrongful, unjust, and/or inequitable practice(s), act(s), omission(s), and/or conduct;

C. disgorgement of all amounts improperly, wrongfully, and/or unjustly charged, collected, received, obtained, received, maintained, or held by Defendant;

D. an award of attorneys' fees and costs, and any other expense, including expert witness fees and costs (if and permitted by law);

E. an award of pre- and post-judgment interest on any amounts awarded;

F. an Order for a legal and/or equitable accounting, including, but not limited to, an accounting for profits;

G. a declaration that a business seeking and/or receiving a refund from the federal government for amounts paid as a result of, due to, and/or to offset any or all the tariffs imposed by the 2025 Executive Orders is not a condition, precondition, or prerequisite for a consumer being able to seek and/or receive a refund(s) of any amounts the consumer paid to a business as a result of, due to, and/or to offset any or all those tariffs; and

H. such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: June 23, 2026                         Respectfully submitted,

                                             **LYNCH CARPENTER LLP**

                                             */s/ Michael H. Sampson*
                                             Michael H. Sampson (PA ID No. 92574)
                                             1133 Penn Avenue, 5th Floor
                                             Pittsburgh, PA 15222
                                             (412) 253-4992
                                             mike@lcllp.com

                                             *Counsel for Plaintiff and the Proposed Class*

22